IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KENDALL DEALERSHIP HOLDINGS, LLC,  )
                                            )
                   Plaintiff,         )
                                            )
     vs.                             )
                                            )
WARREN DISTRIBUTION, INC., a Nebraska  )
Corporation,                          )
                                            )      No. 3:18-cv-0146-HRH
                   Defendant.     )
_____)
                                            )
WARREN DISTRIBUTION, INC.,        )
                                            )
            Third-party plaintiff,   )
                                            )
     vs.                             )
                                            )
ELECTRONIC COMPONENTS          )
INTERNATIONAL, INC. and ELECTRICAL  )
COMPONENTS CANADA, INC.,        )
                                            )
            Third-party defendants.  )
_____)

## O R D E R

### Motion for Summary Judgment

Defendant Warren Distribution, Inc. ("Warren") moves for summary judgment.[1]

Third-party defendants Electrical Components International, Inc. ("ECI") and Electrical

_____

[1]Docket No. 129.

Components Canada, Inc. ("ECC") join in Warren's motion.[2]  The motion for summary judgment is opposed by plaintiff Kendall Dealership Holdings, LLC.[3]  Oral argument was requested and has been heard.

## Facts

This case arises out of claims that some 8,000 engine block heaters which plaintiff purchased from Warren were defective.  The various models of the PU140-00913 engine block heater which are at issue in this case were manufactured by ECC and distributed by ECI.

"The PU140-00913 is a kit consisting of a cord and cartridge heater. . . ."[4]  "The cord in the original PU140-00913 [the '913 heater'] is an HPN cord sleeve with PVC tubing, and it has a molded plastic or molded PVC plug on the wall end and a molded silicone plug on the heater interface end."[5]  The 913 heater had a 400-watt cartridge.

In March of 2017, ECC/ECI put Warren's orders for the 913 heater "on hold" because of "information received from Toyota [Canada] that they may have an issue with their 2016 and 2017 models. . . ."[6]  The issue involved thermal events in seven vehicles in Western

---

[2]Docket No. 143.

[3]Docket No. 162.

[4]Deposition of Duncan Whitelaw at 12:13-14, Exhibit 1 at 3, Kendall Dealership Holdings, LLC's Opposition to Motion in Limine [etc.], Docket No. 161.

[5]Id. at 14:5-9, Exhibit 1 at 5.

[6]Deposition of Daniel McNaught at 23:11-21, Exhibit B, Warren Distribution's
(continued...)

-2-

Canada that had 913 heaters installed. Toyota Canada launched an investigation and ultimately, in July 2017, issued a recall notice, which stated that "[t]he electrical power cords of [some] dealer installed accessory engine block heaters may have been improperly manufactured, resulting in contact between wires that could cause a short circuit. If a short circuit occurs, the wire insulation may overheat, increasing the risk of fire."[7]

In response to the issues Toyota Canada had reported, and while that investigation was ongoing, "as a proactive effort," ECC/ECI "increased the robustness of the cord set"[8] of the 913 heater. ECC/ECI "incorporated a 6-inch piece of silicone wire between the HPN and the molded silicone plug, and . . . changed the sleeving from PVC to fiberglass."[9] The engine block heater with the modified cord was PU140-00913-1 (the "913-1 heater"). The 913-1 heater "retained the 400 watt heating element, which is basically the standard in the industry."[10] ECC/ECI shipped the first 913-1 heaters to Warren in May 2017. Plaintiff

---

[6](...continued)
Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[7]Exhibit C at 1, Warren Distribution's and ECC/ECI's Joint Motion to Strike [etc.], Docket No. 128.

[8]McNaught Deposition at 23:22-24, Exhibit B, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[9]Whitelaw Deposition at 14:19-22, Exhibit 1, Kendall Dealership Holdings, LLC's Opposition to Warren Distribution Inc.'s Motion for Summary Judgment [etc.], Docket No. 162.

[10]McNaught Deposition at 13:13-15, Exhibit B, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

received its first shipment of 913-1 heaters from Warren in August 2017.[11]  However, plaintiff contends that it continued to install the 913 heaters in vehicles it sold until late 2017/early 2018.  At oral argument, counsel for Warren represented, and plaintiff's counsel did not dispute, that about two-thirds of the block heaters at issue in this case were 913 heaters and about one-third were 913-1 heaters.[12]

There is also a 913-2 heater which uses a 202-watt cartridge instead of a 400-watt cartridge and which ECC began selling to Warren in either December 2017 or January 2018.[13]  Warren contends that all engine block heaters sold to plaintiff after March 2018 were 913-2 heaters.  There are no allegations that there have been any problems associated with the 913-2 heater.

Plaintiff contends that it first learned of the Canadian recall of the 913 heater in February 2018 after it became concerned about an increasing number of vehicle fires being reported by its customers.  On March 9, 2018, plaintiff sent an "Urgent Vehicle Safety Notice" to its customers.  The Notice read:

> Toyota Canada has determined that the electrical cords of some
> engine block heaters may have been improperly manufactured,

---

[11]Exhibit C, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129; SEALED Exhibit 6, Docket No. 175-12 at 3.

[12]Transcript of Oral Argument on Motion for Summary Judgment at 4:18-20, Docket No. 236.

[13]Whitelaw Deposition at 56:9-12, Exhibit 1, Kendall Dealership Holdings, LLC's Opposition to Warren Distribution Inc.'s Motion for Summary Judgment [etc.], Docket No. 162.

-4-

potentially leading to a short circuit and increasing the risk of a fire. The manufacturer of the engine block heater has informed us that a replacement part is currently being manufactured but such parts will not be available for the Alaska market for approximately 10 to 12 weeks. Given the potential for fire, Toyota Canada has recommended its Canadian customers disable the engine block heater by severing the power plug from the power cord. Accordingly, Kendall Toyota/Lexus of Anchorage and Kendall Toyota of Fairbanks urgently recommends customers of the affected vehicles discontinue the use of their engine block heater and make an appointment at Kendall Toyota in Anchorage or Fairbanks to render the engine block heater inoperable at no cost to you.[14]

Dave Blewett, plaintiff's CEO, testified that at that time,

the only information I had . . . was the July 2017 recall that said there was a problem with these engine block heaters. And the only thing that we could do, the only information that we had was a direction from Toyota Canada to cut the cord and that the cord was bad. Cut it, so it couldn't be used.

So that's what we did. And from hearing from Jimmy and Dan [at Warren], it appeared to me that they were addressing the problem by putting a different cord on the block heater. So absent any other information, that's what we did. All of our inventory we put on this new cord. We took them off of brand new engine block heaters and put on brand new cords.[15]

Blewett testified that he was later told by Toyota USA that the problem with the block heaters was not the cords, but the wattage of the cartridge.[16]

---

[14]SEALED Exhibit 8 at 3, Docket No. 175-5 (emphasis deleted).

[15]Video 30(b)6 Deposition via Videoconference of David Blewett at 42:13-43:2, Exhibit A, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[16]Id. at 41:22-42:1.

-5-

Plaintiff commenced this case on May 22, 2018. In its complaint, plaintiff alleges that the engine block heaters that it purchased from Warren were "improperly manufactured due to either a short circuit in the electrical cord of the engine block heater and/or too much wattage produced by the engine block heaters."[17] Plaintiff has asserted breach of contract, Unfair Trade Practices Act ("UTPA"), breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose claims against Warren.

Warren, joined by ECC/ECI, now moves for summary judgment on liability on all issues based on a lack of evidence. In the alternative, Warren moves for summary judgment "that the model 913-1 block heater was not defective"[18] and for summary judgment on plaintiff's UTPA claims.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant

---

[17]Complaint at 2, ¶ 11, Exhibit A, Defendant's Notice of Removal, Docket No. 1.

[18]Warren Distribution's Motion for Summary Judgment Regarding Liability Issues at 2, Docket No. 129.

in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

Warren first argues that it is entitled to summary judgment on liability because the undisputed evidence is that engine block heaters that it sold to plaintiff were not defective. This undisputed evidence, according to Warren, includes the Rule 30(b)(6) deposition of Josh Dare, who is the Quality Manager for ECC.[19] Dare testified that he oversaw quality for the 913 engine block heater.[20] Dare testified that in early 2017, ECC analyzed about one hundred 913 engine block heater kits that had been sold to Canadian dealers.[21] This was done as part of the investigation that Toyota Canada had begun after the seven thermal events were reported. Dare testified that

> we reviewed all those cords for potential defects in those areas
> that were flagged earlier. There were some noticeable anoma-
> lies or issues in those, so then we worked with Toyota to

---

[19]Videotaped 30(b)(6) Deposition of Josh Dare at 11:7-8, Exhibit E, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[20]Id. at 11:7-15.

[21]Id. at 24:2-11.

-7-

recreate those same anomalies on new parts, and then we defined a test to simulate root cause and thermal events with those parts that had those anomalies in them.[22]

Dare testified that the anomalies were "exposed copper in the insulation jacket, broken or stray strands in . . . the conductor crimp, . . . and nicks or abrasions to the outside jacket in the molding process."[23]  Dare testified that ECC/ECI and Toyota Canada were attempting to determine whether any of these anomalies "would lead to a thermal event that was reported in the field" but the tests were "inconclusive.  We didn't find a root cause."[24]  Dare testified that they were, however, "able to produce thermal events when we exposed the product to abnormal temperatures."[25]  Dare explained that

[i]t didn't matter what test we threw at the parts when it was within the scope of . . . what the parts are supposed to meet.  The part passed.  They were safe.  They were not producing thermal events.  It was only once we exposed them to elevated temperatures that we could recreate a failure.[26]

Dare testified that the tests confirmed that the cords used in the heaters would perform as intended under normal conditions.[27]  Dare testified that "[a]t that point, we realized that everything that was observed in the manufacturing process that could be considered an issue

---

[22]Id. at 24:15-22.

[23]Id. at 24:25-25:4.

[24]Id. at 25:21-26:1.

[25]Id. at 26:6-7.

[26]Id. at 139:4-9.

[27]Id. at 140:22-25.

-8-

or a concern didn't really play a fact or a – as a factor in the thermal events."[28]  In other words, Dare testified that the anomalies that had been found "became a non-issue. . . ."[29] Dare testified that at that point, ECC/ECI concluded that "[t]here was no root cause" for the thermal events that had occurred in the field.[30]

Warren also cites to the Rule 30(b)(6) deposition testimony of Duncan Whitelaw, ECC's advance design engineer and manager.[31]  Whitelaw testified that the 913 engine block heater that was sold in 2016 had been "tested and found safe, fit for application when properly used."[32]  Whitelaw testified that the testing ECC did in 2017 revealed "no evidence that there was any manufacturing defect or any manufacturing process change that had made them any different."[33]  Whitelaw testified that he "could not find a manufacturing defect" in the 913 heater nor could he "find a design defect."[34]

Warren next cites to the deposition testimony of Dan McNaught, ECC's business development manager, who testified that Toyota Canada

---

[28]Id. at 55:23-56:2.

[29]Id. at 56:8-11.

[30]Id. at 56:12-15.

[31]Whitelaw Deposition at 9:14-20, Exhibit F, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[32]Id. at 140:11-12.

[33]Id. at 140:18-20.

[34]Id. at 142:12-16.

had what they saw as . . . a spike in those seven instances [of thermal events or fires] in Western Canada, they all came relatively close together and because of their geographic area, it showed up and caused a blip on their radar. And because they were . . . they were being overly cautious these days because of the previous issues they had with floor mats, for instance, and the harm that did to their reputation, so they were being overly cautious and they didn't want to . . . they didn't want a repeat of the same situation, so . . . but having said that, they only saw it as a blip on their radar. They wanted to . . . work with us. It was very proactive. It was a collaborative relationship. They wanted to work with us to see what, if anything, was the cause for those seven instances. Unfortunately, they [Toyota Canada] were unable to find any root cause or reproduce it.[35]

Warren also contends that the evidence shows that ECC had multiple manufacturing processes in place in 2016 to prevent product defects. Dare testified that the cords on the engine block heaters were tested "[t]hrough [an] electrical test" called "a hi-pot test – where we charge the – the cord up with 1,500 volts, and it can detect if there's any voltage leakage to one of the other circuits or any kind of shorts in the cord."[36]

Warren argues that the foregoing evidence establishes that there was no manufacturing defect in the cords of the 913 heater. Warren argues that the only possible support plaintiff has for its claim that there was a manufacturing defect in the cords is Shideh's expert opinion that "[t]he evidence pointed to a manufacturing defect in the assembly of the heater female

---

[35]McNaught Deposition at 18:6-22, Exhibit B, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[36]Dare Deposition at 137:6-16, Exhibit E, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

-10-

connector in 2016 and early 2017[,]"[37] an opinion which Warren and ECC/ECI moved to exclude. However, the court denied the motions to exclude Shideh's expert testimony. Shideh's manufacturing defect opinion is sufficient to create a genuine issue of material fact as to whether the 913 heater was defective. Warren is not entitled to summary judgment that the 913 heater was not defective.

But, Shideh's manufacturing defect opinion is limited to the 2016 and early 2017 time frame. As such, this opinion cannot apply to the 913-1 heater because the first 913-1 heaters were not shipped to plaintiff until July or August of 2017,[38] and plaintiff did not "receive[] its first order of the 913-1 kit [until] August of 2017."[39]

Plaintiff argues that the circumstantial evidence shows that the 913-1 heater was defective due to the 400-watt cartridge and such evidence is sufficient to defeat a motion for summary judgment. See Alaska Rent-A-Car, Inc. v. Ford Motor Co., 526 P.2d 1136, 1139 (Alaska 1974) (in breach of warranty case, court observed that "Avis need not eliminate all other possible causes of the brake failure in order to recover. It can make its case through circumstantial evidence. All inferences of fact from the proffered proofs are to be drawn in favor of the party opposing summary judgment, and against the movant."); see also,

---

[37]Shideh Expert Report at 4, Exhibit A, Warren Distribution's and ECC/ECI's Joint Motion to Strike [etc.], Docket No. 128.

[38]Exhibit C, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[39]Kendall Dealership Holdings, LLC's Opposition to Motion in Limine to Exclude Expert Sean Shideh at 7, Docket No. 161.

-11-

Universal Motors, Inc. v. Waldock, 719 P.2d 254, 258 (Alaska 1986) (in breach of warranty cases, "courts have held that circumstantial evidence is enough to support the consumer's burden of proof that the damage was caused by a defect in factory materials or workmanship").

By way of circumstantial evidence, plaintiff points out that the HPN wire, which was used to make the cords for the block heaters and which was supplied to ECC by Southwire, was found to be defective at least once in 2016 and twice in 2017.[40]  Plaintiff also relies on the Toyota Canada recall notice that suggested that there was a problem with the cord of the block heaters.  Plaintiff argues that this evidence, coupled with the fact that Toyota Canada eventually replaced the 400-watt cartridge, shows that these two elements, when used together, made the 913-1 block heater unsafe.  Plaintiff argues that this evidence shows that there was a problem with the cord and that if the cord got too hot, which it was more likely to do with a 400-watt cartridge, then a fire was more likely to occur.

Warren is quick to point out that while Dare did testify about defects in wire supplied by Southwire, he also testified that "[a]ll the defects that were noted in the supplier defect notices we sent to Southwire, we could not find anything in the thermal event samples that we saw that represented that."[41]  Dare testified that "[w]e sent samples to Southwire for

---

[40]Dare Deposition at 93:20-25, Exhibit 3, Kendall Dealership Holdings, LLC's Opposition to Warren Distribution's Motion for Summary Judgment [etc.], Docket No. 162.

[41]Dare Deposition at 141:25-142:3, Exhibit A, Warren Distribution's Reply Brief on Motion for Summary Judgment [etc.], Docket No. 184.

-12-

analysis over various date ranges that we had in stock to do some testing, and they sent us reports confirming that they met the specifications."[42]  As for the recall notice, even assuming that it is admissible,  it pertains to the 913 heater, not the 913-1 heater.

At oral argument, plaintiff's counsel argued that the 913-1 heater was defective because the 400-watt cartridge got too hot.  Plaintiff's counsel contended that

> the defense experts are suggesting that it was not the cord that was the problem[.]   [T]he problem was installation and the installation issue arises because the -- the unit would get too hot. The cartridge, the 400-watt cartridge would get too hot when there was not grease or when the unit was not coming up. So essentially, the cartridge in the 913 and the cartridge in the 913-1 are the same cartridge.  There's no difference between those two.  The only difference is the cord.  So if the cartridge is the source of . . . the thermal events that caused the 913 fires, that's the same cartridge that was used in the 913-1.  There's no difference between the two.[43]

The problem with this argument is that there is no evidence of any thermal events associated with the 913-1 heater.  If it were the 400-watt cartridge that was causing the thermal events, then there would have continued to be thermal events in vehicles that had the 913-1 heater installed.  But, plaintiff has not come forward with evidence of a single thermal event in a vehicle with a 913-1 heater installed.  In fact, plaintiff's expert Shideh repeatedly testified at his deposition, that there were no problems with the block heaters after the

---

[42]Id. at 142:7-10.

[43]Transcript of Oral Argument on Motion for Summary Judgment at 16:19-17:7, Docket No. 236.

recall.[44] In addition, plaintiff's CEO Blewett testified that plaintiff did not have any issues with the 913-1 heater.[45]

Viewing all of the evidence in the light most favorable to plaintiff, no reasonable jury could find that the 913-1 heater was defective. Thus, Warren is entitled to summary judgment that the 913-1 heater was not defective.

Warren next argues that it is entitled to summary judgment on plaintiff's UTPA claims. The UTPA was "designed to meet the increasing need in Alaska for the protection of consumers as well as honest businessmen from the depredations of those persons employing unfair or deceptive trade practices. The act protects the consumer from deceptive sales and advertising practices, and it protects honest businesses from their unethical competitors." Donahue v. Ledgends, Inc., 331 P.3d 342, 353 (Alaska 2014) (internal citation omitted). "Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred." State v. O'Neill Investigations, Inc., 609 P.2d 520, 534 (Alaska 1980).

---

[44]Video Deposition via Videoconference of Shahrokh 'Sean' Shideh, P.E. at 66:18-23; 68:12-19; SEALED Exhibit S at 15, Docket No. 131.

[45]Blewett Deposition at 79:10-16, Exhibit A, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

-14-

In its complaint, plaintiff alleged that Warren violated the UTPA "by falsely representing that the engine block heaters were built to standards that they were not."[46] In its response to Warren's interrogatories, plaintiff clarified that its UTPA claims were based, in part, on an allegation that "Warren knew about the [Toyota Canada] recall of the defective block heater since at least August 2017[,]" but "continued to sell Kendall the improperly manufactured block heater that was known to cause vehicle fires."[47] Warren argues that this cannot be the basis for an UTPA claim because it is undisputed that the Toyota Canada recall was in July 2017, that the subject of the Canada recall was the 913 heater, and that Warren stopped selling the 913 heater to plaintiff in March 2017.

In response, plaintiff contends that Warren should have stopped selling the 913 heater as soon as it knew there might be a problem, which plaintiff contends was in March 2017. McNaught testified that ECC put Warren's orders on hold in March 2017 and explained to Warren that it was doing so because of the information it had received from Toyota Canada about the seven thermal events.[48] Thus, plaintiff argues that Warren knew that there was a problem with the 913 heater in March 2017 but continued to sell it anyway.

---

[46]Complaint at 3, ¶ 22, Exhibit A, Defendant's Notice of Removal, Docket No. 1.

[47]Kendall Dealership Holdings, LLC's Responses to Third Party Defendant's First Set of Discovery Requests [etc.] at 2, Exhibit D, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[48]McNaught Deposition at 23:11-21, Exhibit 4, Kendall Dealership LLC's Opposition to Warren Distribution Inc.'s Motion for Summary Judgment [etc.], Docket No. 162.

-15-

In its interrogatory responses, plaintiff plainly takes the position that Warren violated the UTPA because it knew about the Canadian recall but continued to sell the defective 913 heater.[49] Plaintiff did not state that it was basing a UTPA claim on the fact that Warren knew about the problems with the 913 heater in March 2017. It is too late for plaintiff to change the factual basis for its claims. Warren is entitled to summary judgment on plaintiff's UTPA claim that is based on the allegation that Warren knew there was a problem with the 913 heater but continued to sell it to plaintiff anyway.

In its interrogatory responses, plaintiff also stated that it was basing a UTPA claim on the allegation that it was told that "[a]n initial modification" to the block heaters "included changing the cord material from HPN to Silicon so it could withstand more heat, and adding 3 additional feet of cord" and that this change "would make the units safe."[50] But, plaintiff contends that this was not a true statement because the heaters were still using the 400-watt cartridge, which was "defective and unsafe[.]"[51] Blewett was told the foregoing information in late February/early March 2018, as evidenced by an email exchange between Blewett and Jimmy O'Connor at Warren,[52] which means that it pertains to the 913-1 heater. And, as discussed above in detail, no reasonable jury could conclude that the 913-1 heater was

---

[49]Exhibit D at 2-3, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

[50]Id. at 3.

[51]Id.

[52]Exhibit H, Warren Distribution's Motion for Summary Judgment Regarding Liability Issues, Docket No. 129.

-16-

defective and unsafe. Thus, there was nothing misleading or deceptive about any statements Warren made about the 400-watt cartridge being safe. Warren is entitled to summary judgment on plaintiff's UTPA claim that is based on allegations that Warren's representations that the 913-1 heater was safe were false and/or misleading.

Finally, the court must address ECC/ECI's supplemental argument that this case should be dismissed because of the spoliation of the engine block heaters. In its reply brief, Warren joins in this supplemental argument and states that it "continues to request the court dismiss Kendall's complaint on this alternative ground."[53]

ECI/ECC argues that plaintiff's complaint should be dismissed because

> Kendall and its agents, Federated Service Insurance Company, and retained expert, Sean Shideh, failed to preserve evidence of the electronic block heaters, EBH 913, failed to notify ECI/ECC and Warren of ongoing inspections of vehicles with EBH 913s in them, failed to notify underlying insurers to preserve the subject vehicles, and withheld expert reports of Shideh and of other experts on vehicles for which Kendall intends to rely to prove its claims.[54]

Thus, ECC/ECI

> requests that the court consider, in addition to the arguments presented by Warren in support of its Motion for Summary Judgment, dismissal of the case, since Kendall cannot produce any of the essential pieces of evidence in the case . . . , that is,

---

[53]Warren Distribution's Reply Brief on Motion for Summary Judgment [etc.] at 13, Docket No. 184.

[54]ECI and ECC's Joinder in Warren Distribution's Motion for Summary Judgment [etc.] at 2, Docket No. 143.

> any of the electronic block heaters in question or their cords
> except for the lone cartridge that was in the Toyota Tacoma.[55]

"In diversity cases," such as this one, "state law determines a party's duty to preserve evidence that is outcome-determinative[.]" <u>State Farm Fire and Cas. Co. v. Broan Mfg. Co.</u>, 523 F. Supp. 2d 992, 995 (D. Ariz. 2007). "The duty to preserve relevant information arises when litigation becomes reasonably foreseeable, and the party possessing the information has some notice that the documents [are] potentially relevant to the litigation." <u>Security Alarm Financing Enterprises, L.P. v. Alarm Protection Technology, LLC</u>, Case No. 3:13-cv-00102-SLG, 2016 WL 7115911, at *3 (D. Alaska Dec. 6, 2016).

ECC/ECI argues that Shideh's duty to preserve the engine block heaters from the vehicles he inspected for Federated, plaintiff's insurer, was imposed by the standards set out in NFPA 921: Guide for Fire and Explosion Investigations ("NFPA 921"), a publication issued by the National Fire Protection Association. But, "NFPA 921 expressly provides that it contains only nonmandatory provisions; it merely sets guidelines and recommendations for fire investigations, not requirements." <u>Alford v. Allstate Ins. Co.</u>, Case No. 12-cv-14238, 2013 WL 12181846, at *5 (E.D. Mich. July 8, 2013). Thus, NFPA 921 imposed no duty on Shideh to preserve the engine block heaters from the vehicles he inspected for Federated.

In addition, neither Shideh nor plaintiff had possession, custody, or control of the engine block heaters at the time Shideh inspected the vehicles. A party has possession,

---

[55]<u>Id.</u> at 3.

custody, and control of a document or other evidence "if he has a legal right to obtain it from third parties." Burnett v. United States, Case No. EDCV 15-1707-CAS (KKx), 2016 WL 3392263, at *6 (C.D. Cal. June 14, 2016). Neither Shideh nor plaintiff had the legal right to obtain the engine block heaters from the vehicles that Shideh inspected. Those vehicles were under the custody and control of the vehicle owners' insurance companies, not Federated, plaintiff, or Shideh.

ECC/ECI argues, however, that even if plaintiff did not have custody and control of the vehicles, plaintiff still had an obligation to inform ECI/ECC and Warren about the inspections since plaintiff was contemplating litigation against Warren and/or ECC/ECI by at least December 2017, which was prior to some of the Shideh inspections. "With respect to a party's duty to preserve material evidence, even if the party does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence." May v. F/V LORENA MARIE, Case No. 3:09–cv–00114–JWS–JDR, 2011 WL 5244345, at *5 (D. Alaska May 11, 2011) (citation omitted). The evidence shows that Shideh inspected two vehicles after December 2017, a Highlander and a Lexus. More specifically, the Highlander was inspected on April 24, 2018 and the two inspections of the Lexus were done on March 27, 2018 and June 13, 2018. Plaintiff contends that "[o]n April 19, 2018, [its] counsel provided written notice to Warren Distribution and ECI regarding the

-19-

breach of warranty claim stemming from the sale and purchase of defective block heaters."[56] Thus, by the time of the Shideh inspections of the Highlander and Lexus, plaintiff was plainly contemplating litigation and should have either taken steps to preserve the engine block heaters from the Highlander and the Lexus and/or given notice to Warren and ECC/ECI of the inspections. The question then becomes whether plaintiff's failure to do so warrants the case-dispositive sanction that Warren and ECC/ECI request.

In its supplemental argument, ECC/ECI invokes the court's "inherent power . . . to levy sanctions in response to abusive litigation practices," Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006), in requesting that the court dismiss plaintiff's complaint.[57] "A district court may, under its inherent power to control litigation, levy sanctions for the spoliation of evidence." Peschel v. City of Missoula, 664 F. Supp. 2d 1137, 1141 (D. Mont. 2009). "Dismissal under a court's inherent powers is justified in extreme circumstances in response to abusive litigation practices, and to insure the orderly administration of justice and the integrity of the court's orders." Halaco Engineering Co. v. Costle, 843 F.2d 376, 380 (9th Cir. 1988) (internal citations omitted).

---

[56]Kendall Dealership Holdings, LLC's Opposition to Motion in Limine to Exclude Expert Sean Shideh at 18, Docket No. 161.

[57]In the joint motion to exclude Shideh's testimony for discovery violations, ECC/ECI and Warren relied on both Rule 37 and the court's inherent power. The analysis used to consider whether to impose case-dispositive sanctions is largely the same whether done under Rule 37 or the court's inherent power. OmniGen Research v. Yongqiang Wang, 321 F.R.D. 367, 371 (D. Or. 2017).

-20-

"In cases where the drastic sanctions of dismissal or default are ordered, the range of discretion for a district court is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith." Id. Here, ECC/ECI argues that plaintiff knew by late 2017/early 2018 that there was a problem with the 913 heaters and that the problem might be related to a manufacturing defect. Thus, ECC/ECI argues that it was bad faith for Shideh and/or plaintiff to take no steps to attempt to preserve the engine block heaters from the Highlander and Lexus that Shideh inspected.

While plaintiff should have given Warren and ECC/ECI notice of the Highlander and Lexus inspections, the court is not convinced that plaintiff failed to do so in bad faith. At the relevant time, Shideh was working for Federated and had not yet been retained as an expert in this case, and Federated was focused on the investigating the vehicle owners' claims against plaintiff, not plaintiff's claims against Warren and ECC/ECI.

> But even when the spoliation is less culpable, dismissal may be necessary if the prejudice to the [nonspoiling party] is extraordinary, denying it the ability to adequately defend [or prosecute] its case. The prejudice inquiry, of course, looks to whether the [spoliating party's] actions impaired [the affected party's] ability to go to trial or threatened to interfere with the rightful decision of the case.

Peschel, 664 F. Supp. 2d at 1143 (internal citations omitted) Here, the prejudice to Warren and ECC/ECI has not been "extraordinary." Id. Warren's expert testified that he was prejudiced by not having the vehicles to inspect as he

> would have really liked to have performed some radiographic inspection of the cords and determine whether or not there are conductors touching in the molded silicone plug or not, and that

-21-

> would help me form opinions about whether or not the plugs are
> defective in a way that contributes to the cause of the fire[.[58]]

But despite this alleged prejudice, the expert was able to offer opinions that will allow Warren to defend itself at trial. And this is not a situation in which there is no evidence at all relating to the vehicles Shideh inspected. Rather, there are Shideh's written reports, written notes concerning Shideh's oral reports, and reports from third parties who were at some of the inspections. Many of the reports also contain photographs of the vehicles and their parts. And, as ECC/ECI and Warren have conceded, some of these reports "contain facts/opinions that are favorable to defendants/third party defendants regarding whether the block heater at issue in this case is defective[,]"[59] which will facilitate Warren and ECC/ECI's ability to go to trial, rather than impair it.

"The district court must, before dismissing an action under its inherent powers, [also] consider less drastic sanctions." Halaco Engineering Co., 843 F.2d at 381. There are less drastic sanctions that could be imposed here. Two of the block heaters from vehicles Shideh inspected are apparently still being held by the vehicle owners' insurance companies. Plaintiff could be required to attempt to obtain those heaters from the insurers so that Warren's expert could do the testing he claims he wanted to do. While discovery is closed

---

[58]Deposition of Stanley Jaworski at 96:7-15, SEALED Exhibit FF, Docket No. 131.

[59]Joint Motion in Limine to Exclude Testimony of Expert Sean Shideh at 24, Docket No. 130.

-22-

in this case, it could be reopened to allow this additional discovery to take place.[60] Reopening discovery would certainly cause some delay in the case getting set for trial, but given the backlog due to the COVID-19 pandemic, it is unlikely that this case will be set for trial prior to the last quarter of 2021 or first quarter of 2022.

Based on the foregoing, the court, under its inherent power, declines to dismiss plaintiff's complaint for the failure to take steps to preserve the engine block heaters from the Highlander and the Lexus. A case-dispostive sanction is not warranted under the circumstances.

## Conclusion

Warren's motion for summary judgment[61] is granted in part and denied in part. Warren is entitled to summary judgment that the 913-1 heater was not defective and to summary judgment dismissing plaintiff's UTPA claims. The motion is otherwise denied.

DATED at Anchorage, Alaska, this 9th day of June, 2021.

/s/ H. Russel Holland
United States District Judge

---

[60]In connection with the instant motion for summary judgment, no party has requested that these lesser sanctions be imposed. The briefing on defendants' motion to file a late discovery motion, (Docket No. 226), in which defendants would seek to exclude the testimony of Shideh, has just recently been completed. It is the court's initial perception that this motion should be granted and that defendants should be allowed to file their discovery motion. The court can then take up the issue of lesser sanctions in connection with defendants' discovery motion.

[61]Docket No. 129.

-23-