IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KENDALL DEALERSHIP HOLDINGS, LLC,<br><br>                                  Plaintiff,<br>  vs.<br>WARREN DISTRIBUTION, INC.,<br><br>                                Defendant.<br>_____<br>WARREN DISTRIBUTION, INC.,<br><br>                       Third-Party Plaintiff,<br>  vs.<br>ELECTRICAL COMPONENTS INTERNATIONAL, INC., and ELECTRICAL COMPONENTS CANADA, INC.,<br><br>                     Third-Party Defendants.<br>_____ | No. 3:18-cv-0146-HRH |

O R D E R

<u>Motion in Limine Regarding Steve Colt's Testimony on Damages</u>

Warren Distribution ("Warren") moves this court in limine to strike portions of Kendall Dealership Holdings ("Kendall")'s expert witness Steve Colt's report and to limit his testimony.[1]  Kendall opposes this motion.[2]

---

[1] Docket Nos. 249, 251-1, 281.

[2] Docket No. 264.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages     - 1 -

Background

This case arises from Kendall's claims that approximately 8,000 engine block heaters which it purchased from Warren were defective.[3] Warren allegedly purchased the engine block heaters from Electrical Components International and Electrical Components Canada allegedly manufactured the heaters.[4] The original PU140-00913 heater ("913 heater") is the only heater that remains at issue. Based on this conduct, Kendall has asserted various claims against Warren, including breach of contract, UTPA, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose.[5] In the course of this litigation, the parties have retained various expert witnesses. Kendall has retained Dr. Steve Colt to opine on the amount of damages to which Kendall is entitled for its purchase of defective block heaters from Warren.

Discussion

Warren contends that Kendall seeks to recover the direct cost of purchasing 7,943 block heaters.[6] Kendall charged its customers for these heaters when it originally installed them in their vehicles.[7] Kendall also seeks to recover the "repair order" costs of the block

---

[3] Order on Motion in Limine to Exclude Expert Testimony of Steve Roberts, Docket No. 246.

[4] Third Party Complaint at 3, ¶ 8, Docket No. 21.

[5] Complaint, Exhibit A at 3-5, ¶¶ 16-37, Notice of Lodging of State Court Documents, Docket No. 6.

[6] Dr. Colt Expert Report, Exhibit C at 3, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

[7] Blewett Deposition, Exhibit B at 3-4, 7, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages          - 2 -

heaters that Kendall contends were defective.[8] Kendall mailed 5,594 block heater recall notices to customers.[9] Dr. Colt estimated that between January and August 2018, Kendall generated about 3,150 block heater repair orders, 2,433 for customer-owned vehicles and 717 for inventory vehicles.[10] Additionally, Dr. Colt estimated that Kendall generated 1,382 repair orders between August 2018 and April 2019.[11]

Dr. Colt explains that Kendall generated repair orders for vehicles that received various levels of block heater servicing, including for vehicles where the heaters required no work, where they only required inspections, and where they required disabling, removal, reinstallation, or replacement.[12] Dr. Colt estimated that Kendall had fully completed block heater recall work on about 1,600 of the vehicles for which Kendall had generated block heater repair orders between January and August 2018.[13] Kendall issued monetary refunds to less than ten customers.[14]

Dr. Colt opined that of those vehicles for which Kendall generated repair orders between January and August 2018, in those instances where Kendall had only disabled or removed a block heater, and in some instances just inspected a heater, that Kendall had not

---

[8] Dr. Colt Expert Report, Exhibit C at 4, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

[9] Id. at 13.

[10] Id. at 4.

[11] Id. at 11-12.

[12] Id. at 4-5.

[13] Id. at 12-13.

[14] Blewett Deposition, Exhibit B at 11, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

completed work on those vehicles.[15] Specifically, Dr. Colt opined that Kendall had not completed work on 896 of these vehicles.[16] Dr. Colt opined that on the low end, 672 of these vehicles, or 75 percent, would return for block heater servicing.[17] "The low estimate of 75 [percent] reflects [his] understanding that Kendall will be actively following up with the customers whose heaters were disabled or removed", per a phone conversation with Kendall's counsel.[18] He then opined that on the high end, "the logical upper bound of these losses", every single vehicle would return for servicing.[19]

Dr. Colt also opined that as of April 2019, there were 2,573 vehicles for which notices had been mailed, but for which Kendall had not yet generated repair orders.[20] Dr. Colt opined that, on the low end, 515 of these outstanding vehicles, or 20 percent, would return for block heater servicing, "in [his] professional judgment based on consideration of the pattern of returns so far."[21] He opined that on the high end, every vehicle would return for servicing.[22]

Dr. Colt opined that the "[r]epair costs include the direct cost of technician and service advisor time, plus the indirect costs of parts, admin, and support staff time, [as well

---

[15] Dr. Colt Expert Report, Exhibit C at 12, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

[16] Id. at 12-13.

[17] Id. at 13.

[18] Id.

[19] Id.

[20] Id.

[21] Id. at 13-14.

[22] Id. at 14.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages    - 4 -

as] . . . the indirect costs of shop supplies and general overhead."[23]  In his report, Dr. Colt specifically accounts for the time that greeters, advisors, and technicians spent working on a vehicle when in it came in for servicing.[24]  Dr. Colt valued the repair time at $130 per hour, "which is the loaded or 'burdened' rate charged for repair work."[25]  This rate accounts "for the full cost of providing the service" and "the opportunity cost of tying up repair services . . . that could otherwise generate revenue at that rate."[26]  During Dr. Colt's deposition, he stated that he never received from Kendall any documents that showed that they lost or turned away customers due to the recall, and that he never reviewed records that showed that mechanics, advisors, or greeters worked extra hours as a result of the recall.[27]

According to the affidavit of Grant Olson, the Alaska area general manager for Kendall, over the last six years, all main line service department stalls were consistently full, and rarely were any empty.[28]  Olson further states that "[b]ased on [his] observation, following the recall notice issued by Kendall, [Kendall] had more customers coming in for recall work than [they] had stalls available.  If [they] did not have the recall work, the stalls would be full of paying customers' vehicles.  The repair order records maintained by

---

[23] Id. at 4.

[24] Id. at 4, 7.

[25] Id. at 4.

[26] Id.

[27] Dr. Colt Deposition, Exhibit A at 14-15, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

[28] Affidavit of Grant Olson, Exhibit 2 at 2, Opposition to Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 264-2.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages        - 5 -

Kendall confirm that the stalls were consistently full."[29] Olson further states that he provided Dr. Colt with this information so that he could prepare his report.[30]

Warren now asks this court to limit Dr. Colt's testimony in three ways. Warren contends that Dr. Colt should not be allowed to testify regarding: (1) damages arising from the cost of block heaters that Kendall resold to customers, unless it refunded those customers; (2) damages for the replacement of 913-1 block heaters; and (3) lost opportunity costs.[31] Kendall concedes that Dr. Colt is not allowed to testify regarding damages arising from the replacement of any 913-1 heater, but argues that this limitation can just be addressed in Dr. Colt's testimony, and that he need not amend his report accordingly.[32] Kendall opposes Warren's first and third requested limitations.[33]

As a preliminary matter, damages arising from the replacement of the 913-1 heater are no longer at issue. This court has found that the 913-1 heater was not defective.[34] Thus, Dr. Colt may not testify regarding damages from the replacement of 913-1 heaters.[35]

The court turns to Warren's contention that Dr. Colt should not be allowed to testify about damages arising from the cost of block heaters that Kendall resold to customers, unless it refunded those customers. Kendall contends that Dr. Colt properly measured

---

[29] Id. at 2-3.

[30] Id. at 3.

[31] Docket Nos. 251, 281.

[32] Docket No. 264.

[33] Id.

[34] Order on Motion for Summary Judgment, Docket No. 244.

[35] The court assumes that Dr. Colt's expert report will not be admitted at trial; hence, there is no need for the report to be rewritten.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages  - 6 -

Kendall's damages by determining the cost of refunding Kendall for the defective heaters, rather than by determining the cost of replacement heaters, and asserts that Kendall is not attempting to secure a double recovery. Kendall misconstrues Warren's argument. Warren does not argue that Dr. Colt should not be able to testify that the refund price of the heaters is an inappropriate manner by which to measure damages. Rather, Warren argues that Dr. Colt should not be able to testify that Kendall is entitled to damages for any block heater that it sold to customers where it did not subsequently refund the purchase price to customers. Warren argues, for example, that Kendall is not entitled to damages for block heaters it sold to customers and later disabled, nor for those heaters that it sold to customers where those customers never brought in their vehicles for servicing, nor for any vehicles for which Kendall never mailed a safety notice.[36]

Alaska law governs Kendall's claims. Under Alaska Statute (AS) § 45.02.714(b), "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Alaska law further provides that "[t]he purpose of awarding damages for a breach of contract is to put the injured party in as good a position as that party would have been had the contract been fully performed." Guard v. P & R Enters., Inc., 631 P.2d 1068, 1071 (Alaska 1981) (citing McBain v. Pratt, 514 P.2d 823, 828 (Alaska 1973) and Green v. Koslosky, 384 P.2d 951, 952 (Alaska 1963)). Thus, "[w]hile the wronged party in a breach of contract suit is entitled to the benefit of his bargain, he is not entitled to more than his actual loss." Murray E. Gildersleeve Logging Co. v. N. Timber Corp., 670 P.2d 372, 378 (Alaska 1983).

---

[36] Docket No. 281.

As Warren points out, this court considered a similar issue in its order on Kendall's motion in limine regarding Steve Roberts' testimony.[37] Therein, this court stated that if Kendall "were allowed to recover the cost of engine block heaters it purchased from Warren even if it never refunded that cost to its customers, [Kendall] would be getting a double recovery. . . . [Kendall] would be paid the cost of the heater once when selling the heater to its customers, then a second time in the form of damages from Warren."[38] And this court further observed that the purpose of the special circumstances provision of AS § 45.02.741(b) is to prevent such double recoveries.[39]

As noted above, Kendall charged its customers for these heaters when it originally installed them in their vehicles, and Kendall now seeks to recover the direct costs and the repair order costs of the block heaters that it contends were defective. But as also noted above, Kendall did not open a repair order on every vehicle in which it initially installed a block heater, and only issued cash refunds on less than ten vehicles. To permit Kendall to obtain damages for any heater for which Kendall did not generate a repair order, or for which Kendall did not issue a refund, would be an impermissible double recovery under Alaska law. But Kendall correctly points out that Warren's request is ultimately too broad. To prevent Kendall from presenting evidence on damages in every instance where it did not issue a refund to a customer would be improper because in those instances where Kendall generated one of various types of the block heater repair orders described above, Kendall still may have incurred damages. In those instances, Kendall would not then be

---

[37] Order on Motion in Limine Regarding Steve Roberts' Testimony, Docket No. 246.

[38] Id.

[39] Id.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages        - 8 -

getting a double recovery. Thus, Kendall should be permitted to present Dr. Colt's testimony on damages for those vehicles where it generated a block heater repair order or refunded the price thereof.[40]

Kendall also anticipates that it will at some time incur damages for many vehicles for which repair orders have not been completed or generated. Warren contends that this "ongoing theoretical liability . . . assuming there is one . . . cannot be the basis for damages."[41] Under Alaska law, a lost profits award is improper "if it is the result of speculation"; "lost profits must be proven with reasonable certainty." Guard, 631 P.2d at 1071-72. This means that the trier of fact would "'be able to determine the amount of lost profits from evidence on the record and reasonable inferences therefrom'". Erwin v. Mendenhall, 433 P.3d 1090, 1095-96 (Alaska 2018) (quoting State v. Hammer, 550 P.2d 820, 824 (Alaska 1976)). Thus, in cases involving established businesses, courts have looked to the business' past profits as a sufficient "reasonably certain measure by which to calculate a damage award." Guard, 631 P.2d at 1072.

Dr. Colt estimates that on the low end, about 672 vehicles, or 75 percent of those that have already generated block heater repair orders, will return at some future time for additional block heater servicing. The 672 figure is based on Dr. Colt's understanding, following a conversation with Kendall's attorney, that Kendall will "actively follow[] up" with those customers who only had their heaters disabled or removed, and thus will require

---

[40] Warren does not discuss whether Dr. Colt's testimony properly considers any potential differences in costs between the old and new heaters and the cost of disabling the heaters alone, such that this court need not address the propriety of Dr. Colt's testimony in that respect.

[41] Docket No. 281.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages         - 9 -

additional block heater servicing.[42] Dr. Colt also estimates that 515 vehicles, or 20 percent of those that have not yet generated block heater repair orders, will later come in for servicing. As Dr. Colt explains in his report, the 515 figure is based in part on the percentage of vehicles that received mailers and came in for block heater servicing between January and August 2018 and on the types of services that they received. This 515 figure is based on evidence in the record and is analogous to a review of past profits as a reasonably certain measure by which to calculate damages. Kendall may present Dr. Colt's damages evidence on the low-end estimate of these vehicles that Kendall will have to service at a future date. The jury will decide whether or not Dr. Colt's estimate of future recall work is reasonable.

However, Dr. Colt's high-end estimates of both groups of outstanding vehicles – that is, the estimates that 100 percent of the vehicles in these groups will require block heater servicing in the future and the low end (672 vehicles) opinion – have no basis in the record because there is no evidence that all outstanding vehicles will likely come in for servicing. Kendall is also precluded from presenting damages evidence based on the high-end service estimations because they are unduly speculative. Likewise, Kendall is precluded from presenting damages evidence on any other unaccounted for vehicles, as there is no evidence in the record suggesting that Kendall will incur damages from any such vehicles.

Finally, this court turns to Warren's third contention: that Dr. Colt should not be permitted to testify regarding lost opportunity costs, or lost profits. Warren argues that Dr. Colt should be precluded from testifying in this manner because such damages are not

---

[42] Dr. Colt Expert Report, Exhibit C at 13, Motion in Limine Regarding Dr. Steve Colt's Testimony on Damages, Docket Nos. 249, 251-1.

ORDER – Motion in Limine Regarding Steve Colt's Testimony on Damages - 10 -

supported by any evidence in the record. Warren argues that such testimony would lack foundation and confuse the jury. Warren contends that this testimony is therefore inadmissible under Federal Rule of Evidence 702.

Warren specifically points out that Kendall has produced no evidence that any employees worked extra hours as a result of the block heater recall; that Kendall has produced no evidence that Kendall lost business or customers as a result of recall work; and notes that Kendall seeks damages based on the time that not just mechanics, but also greeters and service advisors, spent working on the recall. Kendall contends this request is premature because Kendall's evidence of lost opportunity costs will be supported by trial testimony from Kendall employees, and supplies the affidavit of Kendall area manager Grant Olson as an offer of proof. In reply, Warren argues that Kendall failed to provide the basis of this damage calculation throughout discovery practice, and that Kendall's untimely affidavit still does not provide a basis for calculating lost revenue.

Federal Rule of Evidence 702, as modified in light of Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993), delineates the circumstances under which certain witnesses may testify as experts:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> . . .
>
> (b) the testimony is based on sufficient facts or data . . . .

Generally, "'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" Synergetics, Inc.v. Hurst, 477 F.3d 949, 955 (8th Cir. 2007) (quoting Bonner v. ISP Tech., Inc., 259 F.3d 924, 929 (8th Cir. 2001)). An expert's

opinion should only be excluded when it is so fundamentally unsupported that it cannot assist the jury. Id. at 956 (quoting Bonner, 259 F.3d at 929-30). Thus, a district court does not abuse its discretion when it excludes expert witness testimony that has "scant basis in the record" and instead rests on speculation or "unsupported assumptions and unsound extrapolation." McGlinchy v. Shell Chem. Co., 845 F.2d 802, 807 (9th Cir. 1988).

As set forth above, Kendall has provided evidence regarding how much time certain employees, including greeters, advisors, and technicians, spent working on a vehicle when it came in for block heater servicing. Dr. Colt's calculation of lost opportunity costs is partially based on this data, which weighs in favor of permitting Dr. Colt to testify regarding lost opportunity damages. But as Warren points out, and the record shows, Dr. Colt reviewed no evidence that Kendall lost business as a result of the recall, nor that Kendall had to pay employees overtime as a result of the recall. Even if this court were to consider the assertions in Greg Olson's untimely affidavit, there is still no evidence that Kendall lost business as a result of the recall because the affidavit contains no allegations that Kendall had to turn away customers as a result of recall work. This weighs against permitting Dr. Colt to so testify.

But Kendall's argument that the heretofore undisclosed factual basis of Dr. Colt's lost opportunity cost testimony will be offered via witness testimony at trial weighs the most against permitting Dr. Colt to testify regarding lost opportunity costs. This effectively constitutes a concession that the factual basis of Dr. Colt's opinion on this form of damages is currently deficient. This is so because if Dr. Colt intended to rely on this undisclosed, additional information in forming his opinion on lost opportunity damages, then under Federal Rule of Civil Procedure 26(a)(2)(B), (E), Dr. Colt was required to provide this information in his report or timely supplement his report with such informa-

tion. Dr. Colt did not do so, and it is now too late to do so. Expert discovery was long ago closed.

Thus, Dr. Colt's testimony regarding lost opportunity costs lacks sufficient factual basis in the record, such that it constitutes improper speculation. Accordingly, Dr. Colt may not testify regarding lost opportunity costs damages.

## Conclusion

As set forth above, Warren's motion in limine regarding Dr. Steve Colt's testimony is granted in part and denied in part.

DATED at Anchorage, Alaska, this  6th  day of October, 2021.

/s/   H. Russel Holland
United States District Judge